IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DONYA VANCE,

                Plaintiff,

v.

ANDREW M. SAUL, Commissioner of
Social Security,

                Defendant.

OPINION AND ORDER

18-cv-470-wmc

---

Pursuant to 42 U.S.C. § 405(g), plaintiff Donya Vance seeks judicial review of a final determination that she was not disabled within the meaning of the Social Security Act. Vance contends that remand is warranted because the administrative law judge ("ALJ") erred in (1) finding that her degenerative disc disease did not meet Listing 1.04, and (2) failing to support her residual functional capacity ("RFC") with substantial evidence. The court held a telephonic hearing on plaintiff's appeal on November 6, 2019. For the reasons that follow, the court rejects both challenges and will affirm the denial of benefits.

BACKGROUND[1]

A. Overview of Claim

Plaintiff Donya Vance applied for social security disability benefits and supplemental social security income in November 2014, claiming an alleged onset date of August 16, 2014. With a birth date of January 31, 1975, Vance was "a younger individual"

---

[1] The following facts are drawn from the administrative record, which can be found at dkt. #10.

for the relevant period of her social security appeal. Vance has past relevant work as a nurse assistant and nursey school attendant. Her claimed disability was based on her heart condition, lower back pain, and asthma. (AR 265.)

B. ALJ's Decision

ALJ John Martin held an in-person hearing on July 6, 2017, in Madison, Wisconsin, at which plaintiff appeared personally and by counsel. As of the alleged onset date, the ALJ found that Vance suffered from the following severe impairments: degenerative disc disease, osteoarthritis and allied disorders, obesity, cardiomyopathy, degenerative joint disease, and asthma. (AR 30.) Plaintiff's appeal concerns the ALJ's treatment of her degenerative disc disease and obesity. As such, the court's review of the ALJ's opinion and the medical record will similarly focus on those areas.

At step three, the ALJ considered whether Vance's impairments met or medically equaled the severity of the listed impairments. Particularly material to this appeal, the ALJ explained that:

> The severity of the claimant's degenerative disc disease does not meet the requirements under Listing 1.04 because there is no evidence of nerve root compression, spinal arachnoiditis resulting in the need for changes in posture more than once every two hours, or lumbar spinal stenosis resulting in inability to ambulate effectively. Medical imaging of her back found a disc protrusion at L5-S1 and L4-L5 (Exhibit 4F/8). However, the claimant is able to walk without assistive devices, is able to perform activities of daily living, and examinations have consistently found normal muscle strength.

(AR 30.) At the same time, the ALJ acknowledged that Vance's "impairments are compounded by obesity," and stated specifically that he considered these impacts in

2

formulating her RFC.

Ultimately, the ALJ determined that Vance had the RFC:

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can stand for a total of 2 hours and walk for a total of 2 hours in an 8-hour workday. The claimant must avoid concentrated exposure to dust, odors, fumes, pulmonary irritants, and temperature extremes.

(AR 31.) With respect to Vance's degenerative disc disease and obesity in particular, the ALJ concluded that "the record supports some back pain, but not to the extent that would preclude the claimant from performing all work." (AR 32.) In support of that finding, the ALJ explained that: (1) "the claimant appears to be able to perform some activities of daily living such as driving, going shopping in stores, and taking care of her three young children"; (2) while acknowledging the 2014 MRI showing a disc protrusion at L5-S1 and L4-L5, a "May 2013 examination noted that the claimant had full muscle strength but also had a slow and steady gait"; (3) physical therapy has "helped with overall improvement in mobility and activity level," and she was noted as having "good rehab potential"; (4) an "April 2015 consultative examination found some limited range of motion in her joints, but also found that the claimant had normal muscle strength, normal motor strength, and was able to get up from a lying position to a standing position without support"; and (5) doctor's records stated that Vance "has some pain relief from medication." (AR 32-33.) The ALJ further explained that he accommodated her back pain and obesity by limiting her to sedentary exertional level of work and by limiting her to "standing/walking up to two hours during an eight hour workday." (AR 33.)

The ALJ also placed great weight on the opinions of state agency medical

consultants Pat Chan, M.D., and Mina Khorshidi, M.D., both of whom determined that Vance could perform work at the sedentary level and can stand *or* walk for a total of 2 hours out of an 8-hour day. (AR 34; AR 104-11 (Chan); AR 136-38 (Khorshidi).) In addition, Dr. Chan considered plaintiff's impairments, determining that they did not "meet or equal a listing." (AR 106.) Chan's and Khorshidi's reports were completed in April 2015 and September 2015, respectively.

The ALJ next noted a consultative examination report by Kauseruzzaman Khan, M.D., dated April 6, 2015, but only placed partial weight on this opinion because the record "supports a conclusion that claimant's pain is managed with medication and . . . [p]hysical therapy notes also support that the claimant has good rehab potential, and the claimant appears to be able to perform activities of daily living despite her chest and back pain." (AR 34.)

Finally, relying on the vocational expert's testimony, the ALJ concluded that Vance could not perform her past relevant work, but that there were jobs in significant numbers in the national economy that Vance could perform, including telephone solicitor, order clerk, and travel clerk. (AR 36.) As such, the ALJ concluded that Vance was not under a disability from August 16, 2014, through the date of his decision.

## C. Medical Record

The court will also focus its review of the medical records on Vance's back condition and pain.[2] Vance saw Allysa Watring, PA-C, for low back and right lower extremity pain

---

[2] Even so, there are extensive medical records detailing Vance's heart issues as well, including that she suffered a heart attack requiring a stent in 2016.

4

on May 1, 2013. She complained that the pain started during her pregnancy, rating it as "10/10 at its worse, but improves slightly after taking medication." (AR 348.) At that time, Vance was taking Vicoprofen and Zanaflex for pain relief. She also stated that the pain is at its worst when "she is walking and staying in one position for too long." (*Id.*) While her physical examination showed full range of motion, "except for limited right hip flexion due to pain," Watring also noted "3/5 motor strength in right hip flexion," and that straight leg raises elicited pain. (AR 351.) Finally, Watring noted a "[s]low but steady gait." (*Id.*)

These findings prompted Watring to refer Vance to neurosurgery and to physical therapy. The record reflects that Vance subsequently attended aqua therapy and showed some improvement. (AR 387.) The record also shows that Vance underwent an MRI on April 18, 2013, which revealed:

> 1. Right paracentral disk protrusion L5-S1 with effacement of the right anterolateral aspect of the thecal sac and displacement of the nerve rootlet sleeve.
> 2. Broad-based central disk protrusion L4-L5 with mild narrowing of the spinal canal and moderate narrowing of the neural foramina bilaterally.

(AR 352.) On June 3, 2013, based on a referral from Watring, Vance was also seen by Merle S. Rust, M.D., for a neurosurgery consultation. After reviewing Vance's record and most recent MRI, Rust found "[c]hronic changes . . . on MRI," but also noting "[n]o weakness of examination." (AR 354.) As for surgery, Rust did not recommend it at the time, noting that she needed to lose weight *and* that "she would need not just a simple diskectomy but most likely a multilevel decompression with fusion." (*Id.*)

At the end of that summer, Vance saw Jamie R. Hitchler, M.D., for pain

5

management. In a note from her appointment on September 2, 2013, Dr. Hitchler summarized that Vance "has been tried on a wide variety of pain medication including Vicoprofen, percocet, and oxycodone," has been taking pills every 4-6 hours, and has escalated the amount of pain pills she has been taking. (AR 391.) This history prompted Hitchler to prescribe Vance a one-time, 30-day supply of hydrocodone until she could be seen by the pain clinic.

Vance saw PA-C Watring again on October 29, 2013, at which point she noted that Vance had been in physical therapy for a few weeks and was asking for more pain medication. (AR 356.) Vance again reported that the aquatic therapy was helping, but there was no place to do it in Beloit. Vance also had been going to the pain clinic, where she was prescribed Tramadol and Gabapentin, but reported that she discontinued taking the Gabapentin due to side effects and that the Tramadol was not giving her sufficient pain relief. Vance described her pain as 10/10 again, specifically noting sharp pain in her lower back traveling down her leg and through her foot. At that point, Watring gave her another referral for aquatic therapy, a refill of hydrocodone-acetaminophen, and advised that she lose weight.

On April 23, 2014, Vance saw Jamie R. Wiseman, M.D., seeking another neurosurgery referral. Vance described her pain as a "constant ache and burning," radiating down her legs and causing numbness in her feet. (AR 399.) At that time, Vance stated that she was only taking Tylenol with Codeine and a muscle relaxant at night because they made her too drowsy to take care of her children during the day. During the physical examination, Dr. Wiseman noted that she stood up from her chair very slowly and walked

with a "slight antalgic gait," specifically noting that "[o]ne leg does appear to swing out further than the other." (AR 400.) By this point, Vance reported that she had completed physical therapy but that it had not helped. She also requested returning to neurosurgery or for another MRI. After contacting neurosurgery, Wiseman informed Vance that she still needed to lose weight before getting another referral to neurosurgery, and instead referred her to a weight loss program. Dr. Wiseman further encouraged Vance to return to the pain clinic to discuss medication.

As described above, Vance was next seen for a consultative examination by Dr. Kahn in March 2015. In his April 2015 report, Dr. Khan noted that Vance has complained of back pain since the birth of her second child in 2011, and now rates her pain as 8/10. He noted that she has a prescription for pain medication. He also reviewed the 2013 MRI, noting that it showed "broad based disc herniation encroaching L-5 nerve bilaterally." (AR 450.) He further noted that Vance was seen by neurosurgery, but that surgery was not advised until she lost weight, which had not occurred. Dr. Khan mentioned that Vance "has been taking Tylenol #3 as needed which keeps her pain under control." (*Id.*) As for Vance's living conditions, Dr. Khan noted that she: "is single, lives with her children. She does very little if any house hold works like cleaning, cooking. Her children do most of the work." (*Id.*) Dr. Khan then appears to limit Vance to: "sit[ting] for 20 minutes, stand[ing] for 15 minutes, lift[ing] 30 pounds, [and] walk[ing] about two blocks." (*Id.*)[3]

During his physical examination, Dr. Khan also noted "tenderness cervical spine,

---

[3] The court says "appears" because Dr. Khan simply may be noting what Vance reported to him, although the ALJ construed this statement to be Khan's opinion on Vance's limitations. (AR 34.) Regardless, plaintiff does not argue that the ALJ erred in discounting Khan's opinion.

7

bilateral shoulders, Lumbar spine, bilateral knees, range of motion is presented separately." (AR 451.) Khan also noted that he could not test coordination of lower extremities due to "discomfort bending her knees," but noted that "[s]he can get up from lying and sitting and from sitting to standing without support." (*Id.*) In conclusion, Dr. Khan stated that Vance: "has significant lumbar degenerative disc disease and osteoarthritis of multiple joints, severest being bilateral knees. She is visibly in distress sitting, standing, walking." (AR 452.) In his notes from her March 26, 2015, visit, Khan further noted that Vance "would benefit from use of a cane." (AR 511.)

On October 3, 2016, Vance saw Luan Elezi, M.D., a new treatment provider, for chronic back pain. Dr. Elezi referred her to physical therapy, which Vance apparently attended, reporting some improvement while still rating her pain as a 5 out of 10. (AR 718, 728-41.)

On January 26, 2017, Vance saw Debasish Bhattacharyya, M.D., for a pain consultation. Dr. Bhattacharyya reviewed her pain history and prior treatment, noting that she "essentially indicated that her pain is a 10" and that it "has not really improved over time." (AR 750.) Bhattacharyya also noted that physical therapy has "helped substantially" and she is hoping to get back into it. The physical examination revealed: "generalized tenderness in all 4 quadrants, suggestive of fibromyalgia"; "mild superimposed pain that is worse in the mid lumbar region"; and "[s]traight leg raising does not elicit any true radicular pain." (AR 753.) Vance's motor strength was noted as normal with normal muscle tone and bulk. Bhattacharyya also described her gait and balance as normal. Dr.

8

Bhattacharyya's impression was that Vance had fibromyalgia.[4] She referred her to aqua therapy, advised that narcotics were not recommended, but provided her with a sleeping pill and some topical analgesic cream.

Finally, the medical records reflect that Vance returned to physical therapy in February 2017 and, after six sessions, she again reported some improvement, including that she could now walk her children to the park two houses away from her home. (AR 762.)

OPINION

The standard by which a federal court reviews a final decision by the Commissioner of Social Security is well-settled. Findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility, or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Accordingly, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards*

---

[4] Bhattacharyya was not aware of Vance's 2013 MRI, specifically noting that "[s]he has not had any MRI or imaging." (AR 750.) Whether Bhattacharyya would have altered her fibromyalgia diagnosis if she had been aware of the 2013 MRI appears unknowable on this record. More importantly, it also appears to be immaterial since Vance is not arguing that the ALJ erred by failing to recognize fibromyalgia as a severe impairment or otherwise accommodate this condition in her RFC.

9

*v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993). At the same time, the court must conduct a "critical review of the evidence," *id.*, and insure that the ALJ has provided "a logical bridge" between findings of fact and conclusions of law, *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

OPINION

I. Treatment of Listing 1.04

Vance asserts that the following listing applies to her chronic back pain:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.04.

Vance argues that the ALJ engaged in a "perfunctory analysis" of Listing 1.04, which is clearly inadequate. (Pl.'s Opening Br. (dkt. #15) 11.) *See Barnett v. Barnhart*, 381 F.3d 664, 669-70 (7th Cir. 2004) (finding the ALJ's "two sentence consideration of the Listing of Impairments [was] inadequate and warrants remand" where ALJ ignored significant medical history and did not consult medical expert regarding equivalency); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) ("[F]ailure to discuss or even cite to a listing, combined with an otherwise perfunctory analysis, may require remand[.]"). While the court agrees that the ALJ's analysis is brief, he does reference Listing 1.04 and expressly found that there was no evidence in the record of any of the three required conditions: (1) nerve root compression; (2) spinal arachnoiditis; or (3) lumbar spinal stenosis resulting in inability to ambulate effectively. (AR 30.) Moreover, in another section of his opinion, the ALJ placed great weight on the opinions of the two state agency consulting physicians, particularly Dr. Chan, who opined that none of the listings applied. *See Schreck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (holding that "ALJ may properly rely upon the opinion of these medical experts" in finding that a listing did not apply); *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015) (explaining that RFC discussion provided necessary detail to review step three determination; not discounted simply because it appeared elsewhere in decision).

In addition to faulting the ALJ generally for a limited explanation, plaintiff argues the MRI showed "effacement of the right anterolateral aspect of the thecal sack and displacement of the nerve rootlet sleeve." (Pl.'s Opening Br. (dkt. #15) 11 (quoting AR

11

352).) From this, she represents, without citing any legal or medical authority, that "[t]his is direct evidence of compromise of the nerve root." (*Id.*) Even assuming that the MRI shows that the nerve root is compromised, however, there is still *no* evidence in the record that this MRI finding satisfies any of the three subparts of Listing § 1.04. *See Coleman v. Astrue*, 269 Fed. App'x 596, 603 (7th Cir. 2008) (claimant failed to prove that impairment satisfied listing because he cited only his own blanket assertion of that fact). In other words, plaintiff has identified nothing in the medical record to support a clear finding of (1) nerve root compression, (2) spinal arachnoiditis, or (3) lumbar spinal stenosis resulting in inability to ambulate effectively.

Moreover, with respect to subpart A specifically, even if the MRI showed "nerve root compression," plaintiff develops no argument, nor points to any law or evidence, that her "nerve root compression" is "characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.04. To the contrary, as detailed above, with the exception of a May 2013 reference to limited motor strength in her right hip flexion (AR 351), the record reflected no motor loss or muscle weakness. (AR 351 ("motor strength and muscle tone normal"); AR 359 (noting motor strength 4/5); AR 511 ("motor: tone, power, normal"); AR 753 ("Motor 5/5 strength in the upper and lower limbs with normal muscle tone and bulk").) Critically here, the Seventh Circuit has held that an ALJ need not explain why an impairment failed to meet or equal a listing where there is no evidence that it did. *Ronning*

*v. Colvin*, 555 Fed. App'x 619, 623 (7th Cir. 2014); *Scheck v. Barnhart*, 357 F.3d 697, 700–01 (7th Cir. 2004) (citing *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988)).

Plaintiff also faults the ALJ for his finding that Vance "is able to walk without assistive devices." (Pl.'s Opening Br. (dkt. #15) 11 (citing AR 30).) This finding appears relevant to subpart C, which requires a showing of "[l]umbar spinal stenosis . . . resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.04. Absent a finding that plaintiff suffers from lumbar spinal stenosis -- an argument plaintiff does not pursue -- whether she can ambulate effectively is immaterial. Nonetheless, the court will briefly address plaintiff's argument that the ALJ's finding that she could ambulate effectively was not grounded in substantial evidence. The pertinent regulation provides:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory

> activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00B(2)(b).

In stating that Vance "is able to walk without assistive devices," the ALJ did not *expressly* state that plaintiff could ambulate effectively. Instead, the ALJ used a shorthand, and plaintiff is correct in pointing out that the use of assistive devices is an *example* of ineffective ambulation, though it is not a requirement. Still, plaintiff offers no evidence that her difficulty in walking would meet the *regulation's* definition. Moreover, after considering the ALJ's full opinion, rather than just his brief explanation rejecting Listing 1.04, the ALJ adequately explained why she did not meet the definition. While the record reflects that she walked slowly, her gait was for the most part described as normal, or at most with a "slight antalgic gait." And while Dr. Kahn recommended that she use a cane, he did not say that a cane was required, nor is there any evidence that Vance did use a cane. Finally, even if there were such a requirement or evidence of use, the regulation offers as an example of ineffective ambulation the use of "two canes," not one.

For these reasons, the court rejects this challenge as a basis for remand.

## II. RFC Formulation

Vance also challenges the ALJ's RFC formulation, arguing that it is not based on substantial evidence. Specifically, Vance takes issue with the ALJ's treatment of (1) her activities of daily living, (2) her use of pain medication, and (3) a statement in her physical therapy records that she has "good rehab potential."

14

The ALJ discounted Vance's testimony about her physical limitations by pointing to other evidence of "claimant's ability to drive, perform errands, and actively take care of her children," which the ALJ found supports a finding that "she still has the ability to perform some work activities." (Pl.'s Opening Br. (dkt. #15) 14 (citing AR 33).) While Vance contends that this analysis has been repeatedly criticized by the Seventh Circuit (*id.* (citing *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011)), and *Carradine v. Barnhart*, 360 F.3d 751, 751 (7th Cir. 2004)), and defendants acknowledged at the hearing that the ALJ's language was "dangerously close" to the Seventh Circuit's criticism, defendant correctly points out that the regulations expressly provide that an ALJ *may* consider a claimant's daily activities in assessing credibility. *See* 20 C.F.R. § 404.1529(c)(3)(i). Moreover, in viewing the full ALJ decision, the ALJ did not rely *solely* on her activities of daily living in rejecting the full range of limitations Vance claimed; instead, the ALJ reviewed the medical record generally, highlighting among other things, evidence of muscle strength, a slow and steady gait, and improvement with physical therapy, as well as evidence, at least with respect to her cardiac condition, that plaintiff was not always compliant with treatment.

Vance nevertheless contends that the ALJ ignored evidence in the record indicating that pain medication provided only slight relief, and she complained of side effects from certain medication -- namely, that the drugs made her drowsy, limiting her to taking them at night only. Consistent with Vance's argument, however, the ALJ only found that Vance had "some pain relief from medications," and did not indicate that pain medication resolved her pain issues. (AR 33.) To the contrary, and as detailed above, the ALJ discounted Vance's complaints of pain based on other evidence in the record, including

15

medical evidence demonstrating good muscle and motor strength, normal gait, performance of some activities of daily living, and improvement with physical therapy, which was noted at times, albeit not consistently. Moreover, the ALJ accommodated her concerns about pain in the RFC by limiting her to "sedentary exertional level." (AR 33.)

Finally, Vance faults the ALJ for relying on a statement in her physical therapy notes that she had "good rehab potential," arguing that "[t]he prospect of improvement in the future is not a relevant consideration in assessing an RFC for the period in question." (Pl.'s Opening Br. (dkt. #15) 15 (citing *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007)).) While the general point is well taken, the ALJ's observation does not reflect a suspect, future-looking view. Instead, the physical therapy note -- and the ALJ's reference to it -- simply suggests that physical therapy could continue to address some of Vance's back issues. Indeed, the medical records repeatedly reflect improvement in Vance's mobility and pain as a result of her physical therapy efforts.[5]

---

[5] While the court rejects these specific arguments, there is a plain error in the ALJ's written RFC formulation. Both the state agency medical consultants and the ALJ in other parts of his opinion limit Vance to two hours *total* of walking or standing in an eight-hour day. (AR 33 ("I accommodated claimant's history of back pain and obesity in the residual functional capacity finding by limiting claimant to work at the sedentary exertional level by limiting her to *standing/walking up to two hours* during an eight-hour workday."); AR 108 (Dr. Chan indicating that Vance could stand and/or walk (with normal brakes) for a total of 2 hours); AR 137 (Dr. Khorshidi with same recommendation)).) The RFC as quoted above from the ALJ's written decision, however, provides that Vance "can stand for a total of 2 hours *and* walk for a total of 2 hours in an 8-hour workday." (AR 31 (emphasis added).) Plaintiff did not point out this error, likely because it is harmless since in providing hypotheticals to the vocational expert, the ALJ limited Vance to "a range of sedentary work" (with additional environmental limitations not relevant to Vance's appeal). (AR 75.) The definition of "sedentary work" under 20 C.F.R. § 404.1567 and the definition of "occasionally" under SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983), in turn, limited her to standing or walking for a *total* of two hours in an eight-hour workday. As such, in finding that she could perform telephone solicitor, order clerk and travel clerks jobs, neither the VE nor the ALJ was relying on an RFC finding that she could stand for two hours *and* walk for two hours in an eight-hour workday.

ORDER

IT IS ORDERED that:

1) The decision of defendant Andrew M. Saul, Commissioner of Social Security, denying plaintiff Donya Vance's application for disability benefits is AFFIRMED.

2) The clerk of court is directed to enter judgment for defendant.

Entered this 7th day of November, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge